UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

BRIAN KEITH WALKER, JR.         CIVIL ACTION NO. 6:20-cv-00217

VERSUS                            JUDGE JUNEAU

U.S. COMMISSIONER,          MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision should be affirmed.

## Administrative Proceedings

The claimant, Brian Keith Walker, Jr., fully exhausted his administrative remedies before filing this action. He filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), alleging disability beginning on June 11, 2016.[1] His applications were denied.[2] He requested a hearing, which was convened on December 6, 2018 before Administrative Law

---

[1]      Rec. Doc. 7-1 at 182, 184.

[2]      Rec. Doc. 7-1 at 76-77.

Judge Sherry Schallner.[3]  But the hearing was postponed so that Mr. Walker could secure representation.  Another hearing was held on March 11, 2019 before ALJ Schallner.[4]  The ALJ ruled on May 8, 2019 that the claimant was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision.[5]  The claimant requested review of the ALJ's decision, but the Appeals Council found no basis for review.[6]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[7]  The claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Mr. Walker was born on June 7, 1978.[8]  At the time of the ALJ's decision, he was forty years old.  He graduated from high school and completed two years of college, obtaining an associate's degree in paralegal studies.[9]  He has relevant work experience as a seismic driller and inspection technician in the energy services

---

[3]    A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 71-74.

[4]    A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 22-68.

[5]    Rec. Doc. 7-1 at 16-26.

[6]    Rec. Doc. 7-1 at 6.

[7]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[8]    Rec. Doc. 7-1 at 36, 182, 184.

[9]    Rec. Doc. 7-1 at 36-37, 216.

industry.[10]  He alleged that he has been disabled since June 11, 2016[11] due to ankle pain, foot pain, back pain, and depression.[12]

On July 22, 2015,[13] Mr. Walker saw cardiologist Dr. Brent Rochon who diagnosed him with shortness of breath, angina pectoris, obesity, essential hypertension, and an abnormal stress test that showed inferior ischemia.  On August 3, 2015, Mr. Walker had a coronary angiogram, left heart catheterization, and left ventriculogram.[14]  When he followed up with Dr. Rochon on September 23, 2015,[15] his blood pressure was elevated, and he was prescribed Isosorbide Mononitrate, Norvasc, Lisinopril, Aspirin, Niaspan, and Labetalol.

On June 11, 2016, Mr. Walker presented at the emergency room of Opelousas General Health System in Opelousas, Louisiana, having sustained a gunshot wound to the left ankle.[16]  Dr. Gary Porubsky performed surgery, including irrigation and debridement of the wound, removal of the bullet and other foreign material, and open reduction and internal fixation of the fractured navicular bone and the joint between

---

[10]      Rec. Doc. 7-1 at 41-44, 216, 223.

[11]      Rec. Doc. 7-1 at 182, 184, 215.

[12]      Rec. Doc. 7-1 at 78-79, 215.

[13]      Rec. Doc. 7-1 at 481-484.

[14]      Rec. Doc. 7-1 at 490-492.

[15]      Rec. Doc. 7-1 at 485-488.

[16]      Rec. Doc. 7-1 at 331-351, 395-399, 400.

the navicular and cuneiform bones in the left foot.  Mr. Walker was prescribed medication for his hypertension, which was described as "previously uncontrolled." It was also noted that Mr. Walker had an elevated creatinine reading, "most likely due to some chronic kidney disease related to hypertension."

Mr. Walker continued to treat with Dr. Porubsky, seeing him approximately once a month for the next two years.  On June 16, 2016,[17] Dr. Porubsky noted that Mr. Walker was complaining of discomfort in his left foot and had some swelling and drainage.  He prescribed Percocet and advised Mr. Walker to continue taking Motrin.  On June 23, 2016, Dr. Porubsky noted that the wound was healing satisfactorily.[18]  Mr. Walker saw Dr. Porubsky again on July 7, 2016.[19]  Mr. Walker's left foot was swollen, and Dr. Porubsky cautioned him not to bear weight on the foot and to keep it elevated.  Dr. Porubsky also advised him to take an aspirin a day to help prevent thrombophlebitis.  Dr. Porubsky was concerned that Mr. Walker was developing heel cord tightness but noted that he was "healing satisfactorily."  When Mr. Walker returned to see Dr. Porubsky on July 28, 2016,[20] there was swelling about the midfoot and forefoot and tenderness to palpation.  X-rays showed

---

[17]    Rec. Doc. 7-1 at 394.

[18]    Rec. Doc. 7-1 at 393.

[19]    Rec. Doc. 7-1 at 392.

[20]    Rec. Doc. 7-1 at 391.

satisfactory healing at the fracture site.  Mr. Walker was to elevate his left leg, work on the range of motion in his ankle and toes, and begin weight bearing in a week, as tolerated.  He was given elastic tubing for swelling and a prescription for Percocet.

When Mr. Walker saw Dr. Porubsky on September 22, 2016,[21] his foot was tender to palpation and swollen.  He reported that it felt like something in his foot would break when he walked.  Dr. Porubsky advised him to work vigorously on the range of motion in his ankle and to apply weight as tolerated.  X-rays showed satisfactory healing of the bones.  Percocet was continued.  Dr. Porubsky opined that Mr. Walker was "not able to return to his previous level of employment."

Mr. Walker saw Dr. Porubsky again on October 20, 2016.[22]  He complained of stiffness, shocking pain, and a pressure sensation.  His foot was swollen, there was numbness over the dorsal aspect of the great toe, and he walked with a shuffling gait.  Dr. Porubsky noted that he felt Mr. Walker's prognosis was poor.  Percocet was continued.

In the treatment note for November 17, 2016,[23] Dr. Porubsky noted that the surgical wound was well healed but there was residual swelling and Mr. Walker complained about a sensation of electricity over the dorsal aspect of his left foot.

---

[21]    Rec. Doc. 7-1 at 390.

[22]    Rec. Doc. 7-1 at 389.

[23]    Rec. Doc. 7-1 at 420.

His discomfort had not improved. X-rays showed that the bones had healed satisfactorily. Dr. Porubsky described his prognosis as guarded. He advised Mr. Walker to wear support hose and to work on the range of motion in the ankle and toes. The Percocet prescription was continued, and Gabapentin was prescribed. Again, Dr. Porubsky noted that Mr. Walker had a shuffling gait.

Mr. Walker wore sandals to his December 19, 2016[24] appointment with Dr. Porubsky and reported that he had trouble wearing boots due to his swollen foot. Dr. Porubsky observed "significant swelling about the midfoot." Dr. Porubsky also noted that Mr. Walker "is not able to return to any of [his] previous jobs. I am not sure that he will ever be able to return to this type of work. At best he can stand for approximately ten minutes at a time before he has to sit down. This patient is not currently employable doing these types of manual labor. Again, I do not know if he will ever be able to return to these types of employment." Dr. Porubsky also noted that "I feel that the patient's prognosis for further improvement is poor."

Mr. Walker saw Dr. Porubsky again on January 19, 2017.[25] The swelling was worse, and his foot was tender to palpation. Dr. Porubsky noted Mr. Walker's shuffling gait, advised him to take Advil, and continued the Percocet prescription. Dr. Porubsky wrote: "At this time I do not feel the patient can return to his previous

---

[24]    Rec. Doc. 7-1 at 419.

[25]    Rec. Doc. 7-1 at 418.

level of employment.  He is not improving and unless something changes he will never be able to return to his previous level of employment."

When Mr. Walker saw Dr. Porubsky on February 16, 2017,[26] he complained of discomfort in his left foot, low back discomfort due to being unbalanced in his gait, and pain in his right foot due to favoring his left foot.  Swelling was observed. Dr. Porubsky noted that there had been no significant progress over the last several months.  He opined that Mr. Walker's prognosis with regard to returning to his previous level of employment was poor.  Dr. Porubsky was considering removal of the hardware and fusion of the bones, but he noted that this would make Mr. Walker's midfoot significantly stiff and might not resolve his discomfort.

Dr. Porubsky wrote a letter dated February 16, 2017,[27] in which he opined that Mr. Walker had not made any significant progress in several months, his swelling and discomfort had not improved, and his prognosis for further improvement was poor.  Dr. Porubsky stated that Mr. Walker might require further surgical intervention and opined that Mr. Walker might not "ever be able to return to his previous level of employment."

---

[26]    Rec. Doc. 7-1 at 416.

[27]    Rec. Doc. 7-1 at 415.

7

Mr. Walker reported no changes in his symptoms to Dr. Porubsky on March 16, 2017.[28]  Measurements documented swelling of the left foot as compared to his right foot.  According to the treatment note, Mr. Walker's prognosis for further improvement remained poor because he "has not improved" and was "essentially at maintenance condition."  Dr. Porubsky indicated that he was considering a CT scan of the foot and a consultation with Dr. Chris Hebert regarding the possibility of a midfoot arthrodesis.  A CT scan was obtained on March 29, 2017.[29]

Mr. Walker returned to Dr. Porubsky on April 17, 2017.[30]  His foot was tender and swollen.  He was again prescribed Percocet, and the possibility of an arthrodesis procedure was discussed.

Mr. Walker again saw Dr. Porubsky on May 30, 2017.[31]  Nothing had changed, and Mr. Walker was advised to lose weight.

When Mr. Walker next saw Dr. Porubsky on July 3, 2017,[32] he was still limping, still complaining about discomfort in his left lower extremity, and still taking Percocet.  Dr. Porubsky was considering a pain management program.

---

[28]    Rec. Doc. 7-1 at 414.

[29]    Rec. Doc. 7-1 at 421.

[30]    Rec. Doc. 7-1 at 413.

[31]    Rec. Doc. 7-1 at 411.

[32]    Rec. Doc. 7-1 at 410.

Mr. Walker's condition remained unchanged when he saw Dr. Porubsky on July 31, 2017[33] and August 28, 2017.[34]  On August 30, 2017,[35] Dr. Porubsky noted that he had spoken with Dr. Chris Hebert about Mr. Walker's condition and would be making an appointment for him to see Mr. Walker.  On September 25, 2017,[36] Dr. Porubsky reiterated that there had been no change in Mr. Walker's condition and that he was planning to make an appointment for Mr. Walker with Dr. Hebert.

Mr. Walker first saw Dr. Hebert on October 9, 2017.[37]  Upon examination, Dr. Hebert observed moderate swelling over the midfoot, a rigid hindfoot, moderate varus, and numbness over the dorsal foot.  There was slight tenderness over the navicular-cuneiform joint, and severely limited range of motion in the subtalar joint. Imaging showed degenerative changes at the talonavicular and naviculocuneiform joints.  Dr. Hebert's impressions were left foot and ankle pain and arthritis of the left foot talonavicular and naviculocuneiform joints with neuroma of the dorsal foot.  He planned to assess the extent of the arthritis but stated that Mr. Walker would likely

---

[33]    Rec. Doc. 7-1 at 409.

[34]    Rec. Doc. 7-1 at 408.

[35]    Rec. Doc. 7-1 at 407.

[36]    Rec. Doc. 7-1 at 406.

[37]    Rec. Doc. 7-1 at 469-471.

need surgery including a triple shortening of the lateral column with possible naviculocuneiform fusion and hardware removal with nerve decompression.

Mr. Walker again saw Dr. Hebert on November 3, 2017.[38] Dr. Hebert stated that the arthritis in Mr. Walker's left foot had not changed. He also noted that Mr. Walker was motivated to return to work if his pain could be improved. Dr. Hebert noted that Mr. Walker's pain would likely be improved with surgery including a triple arthrodesis with some shortening of the lateral column and possibly naviculocuneiform revision.

Mr. Walker saw Dr. Porubsky again on January 15, 2018.[39] Dr. Porubsky noted that Dr. Hebert had been unable to obtain Medicaid authorization for a CT scan that was necessary before surgery with Dr. Hebert. Dr. Porubsky renewed the Percocet prescription. He also stated that Mr. Walker was not able to return to his previous level of employment and might not ever be able to do so.

Mr. Walker returned to Dr. Porubsky on February 12, 2018.[40] He still had not had the CT scan or the surgery recommended by Dr. Hebert. Dr. Porubsky observed swelling of Mr. Walker's foot, and the foot was tender to palpation. Dr. Porubsky was unable to palpate a dorsalis pedis pulse or a posterior tibial pulse. Dr. Porubsky

---

[38]    Rec. Doc. 7-1 at 463-465.

[39]    Rec. Doc. 7-1 at 432.

[40]    Rec. Doc. 7-1 at 430.

had no recommendations except continued Percocet, but he noted that Mr. Walker would likely need to be placed in a pain medication management program.

Mr. Walker saw Dr. Porubsky again on March 12, 2018.[41]  He continued to complain of discomfort in the left foot, which was swollen and tender to palpation. He also complained of discomfort in his right foot.  X-rays of the right foot did not identify any significant abnormalities.  He was continued on Percocet.

A CT scan of Mr. Walker's left foot was obtained on April 16, 2018,[42] which showed a fracture of the medial metallic post within the cuboid bone with apparent loosening of the remainder of the metallic foci within the navicular and cuboid bones; chronic posterior phrenic changes within the lateral aspect of the foot, and sclerosis of the navicular bone.

Mr. Walker returned to Dr. Porubsky on April 19, 2018.[43]  The CT scan was reviewed, Percocet was continued, and Mr. Walker was to make an appointment with Dr. Hebert.

Mr. Walker again saw Dr. Hebert on July 2, 2018.[44]  He reported continued pain and tenderness of the dorsum of the foot, lateral ankle, and medial ankle; mild

---

[41]     Rec. Doc. 7-1 at 428.

[42]     Rec. Doc. 7-1 at 427.

[43]     Rec. Doc. 7-1 at 424.

[44]     Rec. Doc. 7-1 at 435-442.

discomfort on the right side from altered weight bearing; and he felt as if his toes were drawing up. Dr. Hebert reviewed the imaging, which showed evidence of necrosis. His impressions were unchanged arthritis of the left foot involving the talonavicular joint as well as a possible naviculocuneiform nonunion. He noted that there appeared to be poor blood supply to one of the bones or, alternatively, an infection with osteomyelitis. He stated that Mr. Walker needed hardware removal surgery with fusion of the midfoot. He indicated that ileac crest bone graft would be likely. Mr. Walker requested a Percocet prescription, but Dr. Hebert stated that his office did not prescribe narcotics for chronic pain. However, Mr. Walker would get one prescription for pain medication before surgery and one after surgery. Dr. Hebert recommended that he find alternative ways to control his pain. He prescribed a left walking boot for stabilization. Mr. Walker was counseled on losing weight.

On July 13, 2018, Mr. Walker had a normal chest x-ray at Park Place Surgical Hospital.[45] But that same day, he was admitted to Our Lady of Lourdes Regional Medical Center in Lafayette, Louisiana[46] with diagnoses of non-ST segment elevation myocardial infarction, which is a type of heart attack, hypertensive urgency, and abnormal EKG. The treatment notes indicate that he was planning to have elective foot surgery but had not been taking any blood pressure medication.

---

[45]     Rec. Doc. 7-1 at 443.

[46]     Rec. Doc. 7-1 at 500-511.

He was discharged from the hospital on July 16, 2018, with prescriptions for Aspirin, Lipitor, Hydrodiuril, Lisinopril, and Lopressor.

On August 15, 2018, Mr. Walker followed up with Dr. Rochon.[47]  His blood pressure was "moderately controlled."  Mr. Walker was 5'9" tall and weighed 318 pounds.  His blood pressure was 189/110.

On March 11, 2019, the claimant testified at a hearing regarding his symptoms, his medical treatment, and his functionality.  Mr. Walker explained that he was laid off from his oilfield-related employment and collected unemployment benefits before being injured in June 2016 when he was shot in the left ankle, breaking several bones.  He had surgery and hardware was implanted in his foot.  He claims, however, that his foot never healed properly and that he had not been comfortable since the incident.  He testified that his left foot is always swollen, that there is a big bump on the top of his foot, and that he cannot wear a boot or a shoe that must be laced over the foot.  He testified that standing up for ten to fifteen minutes causes his left foot to swell and stated that he cannot put pressure on that foot.  He explained that the injury to his left foot had caused him to rely more on his right leg, resulting in his right knee being swollen because it was used so much.  He also stated that changing the way he walks had caused back pain.  He stated that he

---

[47]     Rec. Doc. 7-1 at 493-499.

could not move quickly and was in constant pain.  However, he no longer took any pain medication due to side effects of constipation and stomach pain.  He testified that he was never comfortable, had difficulty sitting, had to change positions frequently, and never slept more than three hours at a time because he could not find a comfortable sleeping position.

Mr. Walker testified that he did not do yard work or household chores except for folding clothes.  He did not prepare his meals unless making a sandwich or snack. He drove only when absolutely necessary.  He did not attend church because he could not sit comfortably.  His social life was diminished.  He performed his personal hygiene but "everything is a slow process."

Mr. Walker testified that he took medication for his uncontrolled high blood pressure, which caused him to urinate frequently.  He could no longer walk for exercise and had gained weight due to inactivity.  He was always drowsy and sleepy because he had trouble sleeping through the night.  He complained that his concentration was impaired, his attention span was limited, and his constant pain and discomfort led to frustration and mood swings.

Mr. Walker explained that he had been scheduled to have a second surgery on his left foot to remove the hardware in hopes that his foot would then heal properly, but his blood pressure was too high, and the surgery was cancelled.  His primary complaint is constant pain.

14

Mr. Walker now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[48] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[49] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[50]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[51] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[52] Conflicts in

---

[48]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[49]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[50]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[51]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[52]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

15

the evidence[53] and credibility assessments[54] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[55]

## B.    **Entitlement to Benefits**

The DIB program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence,[56] while the SSI program provides income to disabled individuals who meet certain income and resource requirements.[57]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

---

[53]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[54]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[55]    *Wren v. Sullivan*, 925 F.2d at 126.

[56]    See 42 U.S.C. § 423(a). See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[57]    42 U.S.C. § 1382(a)(1) & (2). See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

last for a continuous period of not less than twelve months."[58]  A claimant is disabled

only if his physical or mental impairment or impairments are so severe that he is

unable to not only do his previous work, but cannot, considering his age, education,

and work experience, participate in any other kind of substantial gainful work which

exists in significant numbers in the national economy, regardless of whether such

work exists in the area in which the claimant lives, whether a specific job vacancy

exists, or whether the claimant would be hired if he applied for work.[59]

## C.    Evaluation Process and Burden of Proof

A sequential five-step inquiry is used to determine whether a claimant is

disabled.  The Commissioner must determine whether the claimant (1) is currently

working; (2) has a severe impairment; (3) has an impairment listed in or medically

equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do

the kind of work he did in the past; and (5) can perform any other work.[60]

Before going from step three to step four, the Commissioner evaluates the

claimant's residual functional capacity[61] by determining the most the claimant can

still do despite his physical and mental limitations based on all relevant evidence in

---

[58]     42 U.S.C. § 1382c(a)(3)(A).

[59]     42 U.S.C. § 1382c(a)(3)(B).

[60]     20 C.F.R. § 404.1520.

[61]     20 C.F.R. § 404.1520(a)(4).

the record.[62]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[63]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[64]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[65]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[66]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[67]

---

[62]     20 C.F.R. § 404.1545(a)(1).

[63]     20 C.F.R. § 404.1520(e).

[64]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[65]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[66]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[67]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.**    **The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since June 11, 2016. This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  status post-fracture of the left ankle, arthritis of the right knee, hypertension, ischemic heart disease, and obesity. This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except for the following: he can lift and carry less than ten pounds occasionally or frequently; can frequently balance on a flat surface; can frequently stoop; can occasionally kneel and crawl; can never crouch; can never climb ladders, ropes, or scaffolds; must avoid unprotected heights and moving mechanical parts; must avoid concentrated exposure to extreme cold and vibration; and can understand, remember, and carry out simple instructions. The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing his past relevant work.  The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from June 11, 2016 through the date of the decision because there are jobs in the national economy that he can perform.  The claimant challenged this finding.

**E.    <u>The Allegations of Error</u>**

The claimant failed to clearly and specifically articulate the ALJ's alleged errors as required by the court's scheduling order.[68]  However, this Court interprets the claimant's brief as alleging two errors:  that the ALJ failed to recognize that Mr. Walker cannot engage in substantial gainful employment on a day-to-day basis and that the ALJ failed to properly weigh the opinions of Mr. Walker's treating physician, Dr. Porubsky.

**F.    <u>Did the ALJ Properly Evaluate the Claimant's Ability to Sustain Employment?</u>**

Mr. Walker argued that the ALJ failed to properly evaluate his ability to sustain employment.  An ALJ is not required to make a specific finding regarding a claimant's ability to sustain employment in every case.[69]  Such a finding is necessary

---

[68]    Rec. Doc. 6 at 2.

[69]    *Perez v. Barnhart*, 415 F.3d at 465.

only when the claimant has an impairment that waxes and wanes.[70]  To trigger specific findings regarding the sustainability of employment, a claimant must set forth evidence of two factors: 1) that his ability to sustain employment is compromised by his symptoms; and 2) his condition, by its very nature, waxes and wanes in its manifestation of disabling symptoms.

Mr. Walker's primary complaint is pain.  Pain can constitute a disabling impairment,[71] but only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[72]  Mild or moderate pain is not disabling.  Furthermore, subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence.[73]  While an ALJ must take into account a claimant's subjective allegations of pain in determining residual functional capacity, the claimant must produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged.[74]  The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain does not

---

[70]    *Perez v. Barnhart*, 415 F.3d at 465.

[71]    *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

[72]    *Falco v. Shalala*, 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).

[73]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

[74]    *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

take precedence over conflicting medical evidence.[75]   The absence of objective factors can justify the conclusion that a witness lacks credibility.[76]

In this case, there certainly are objective reasons for Mr. Walker's pain complaints.  But Mr. Walker did not establish that the continued problems with his left foot cause intractable, disabling pain.  Although he was prescribed Percocet for pain for approximately two years, he no longer takes any pain medication at all.  This indicates that the pain allegedly caused by the condition of his left foot is not as severe as the claimant contends.

Furthermore, there is no evidence that he has a condition that waxes and wanes in severity or in the manifestation of pain.  When a claimant has no impairments characterized by waxing and waning symptoms, "the claimant's ability to maintain employment is subsumed in the RFC [residual functional capacity] determination."[77] "A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant

---

[75]    *Harper v. Sullivan*, 887 F.2d at 96.

[76]    *Dominguez v. Astrue*, 286 Fed. App'x 182, 187 (5th Cir. 2008), citing *Hollis v. Bowen*, 837 F.2d at 1385.

[77]    *Perez v. Barnhart*, 415 F.3d at 465.

can hold whatever job he finds for a significant period of time."[78]  "[T]he ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find and hold a job in the real world."[79]  This requirement extends to cases involving mental as well as physical impairments.[80]

Therefore, the ALJ's finding that the claimant has the residual functional capacity to perform sedentary work with the exceptions noted in the ruling must be understood as implicitly incorporating a finding that he is capable of sustaining employment in such a job.  Because the ALJ applied the proper legal standard and because the residual functional capacity finding is supported by substantial evidence in the record, the ALJ did not err in failing to address whether the claimant can sustain employment or in implicitly finding that the claimant can sustain employment.

## G.    **Did the ALJ Properly Weigh the Medical Opinions?**

Mr. Walker argued that the ALJ failed to give proper weight to the opinions of his treating physician, Dr. Gary Porubsky.  Although the claimant did not specifically identify which of Dr. Porubsky's opinions he thought were improperly

---

[78]    *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986) (emphasis in original).

[79]    *Singletary v. Bowen*, 798 F.2d at 822 (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984)).

[80]    *Watson v. Barnhart*, 288 F.3d 212, 217-18 (5th Cir. 2002).

weighed, Dr. Porubsky's treatment notes are replete with the opinion that Mr. Walker might not ever be able to return to the type of work he did before he was shot in the ankle. This Court assumes that this is the opinion that the claimant contends should have been given controlling weight by the ALJ.

With regard to applications for disability benefits filed before March 27, 2017, the opinions of treating sources were given controlling weight; for applications filed after that date, the opinions of treating sources are no longer given controlling weight, pursuant to an amendment to the relevant rule.[81]  Because Mr. Walker filed his applications for benefits in 2016, the earlier version of the rule applies.

The applicable rule explains how medical opinions are to be weighed.[82]  The ALJ must evaluate all evidence in the case and determine the extent to which medical source opinions are supported by the record.  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with. . . other substantial evidence."[83]  However, "the ALJ is free to reject the opinion of any physician when the evidence supports a

---

[81]    See 20 C.F.R. § 404.1520c; 20 C.F.R. § 404.1527 ("For claims filed. . . before March 27, 2017, the rules in this section apply.  For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

[82]    20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[83]    20 C.F.R. § 404.1527(d)(2).

contrary conclusion."[84]  When rejecting the medical opinion of a treating physician, the ALJ must provide an explanation supported by good cause.[85]  Even when a treating physician's medical opinions are not given controlling weight, the statute requires that they must be weighed in light of the length of treatment, nature and extent of treatment, supportability, consistency, specialization, and any other relevant factors.  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[86]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[87]

In this case, the ALJ did not state how much weight she gave to Dr. Porubsky's opinions.  This was a significant error.  But it was a harmless error.  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administration conclusion would have been reached absent the error.[88]

---

[84]    *Martinez v. Chater*, 64 F.3d at 175-75 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

[85]    See *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000).

[86]    *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-44 (5th Cir. 2009).

[87]    *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-44.

[88]    See *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

25

In his treatment notes, Dr. Porubsky opined several times on Mr. Walker's ability to return to work.  Every time he did so, he indicated that Mr. Walker would not be able to return to the same type of work that he performed before he was injured.  The ALJ agreed with that opinion and specifically found that Mr. Walker could no longer do his past relevant work.  Before the accident Mr. Walker had two relevant jobs.  The vocational expert characterized one as medium but performed at the very heavy exertional level and the other as light but performed at medium exertional level.  The ALJ determined that, following the accident and with the continued problems with his left foot, Mr. Walker was only capable of performing less than the full range of sedentary work.  Thus, Dr. Porubsky's opinions are consistent with the ALJ's evaluation of Mr. Walker's residual functional capacity. It is conceivable that, even if the ALJ had expressly given Dr. Porubsky's opinions controlling weight, her residual functional capacity ruling would not have changed. Accordingly, the ALJ's failure to state the amount of weight she gave to Dr. Porubsky's opinions was harmless error that does not require remand of the Commissioner's decision.

## Conclusion and Recommendation

Based on the foregoing analysis and for the foregoing reasons, this Court recommends that the decision of the Commissioner should be AFFIRMED and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[89]

Signed in Lafayette, Louisiana, this 14th day of December 2020.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[89]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).